541 S.E.2d 813

The STATE, Respondent,

v.

Jeffrey L. JONES, Appellant.

No. 25242.

Supreme Court of South Carolina.

Heard Oct. 3, 2000.
Decided Jan. 24, 2001.
Rehearing Denied Feb. 21, 2001.

Assistant Appellate Defender Robert M. Dudek, of the South Carolina Office of Appellate Defense of Columbia, for appellant.

Attorney General Charles M. Condon; Chief Deputy Attorney General John W. McIntosh; Assistant Deputy Attorney General Donald J. Zelenka; Assistant Attorney General Jeffrey A. Jacobs, all of Columbia; and Solicitor Donald V. Myers, of Lexington, for respondent.

PLEICONES, Justice:

Appellant was convicted of two counts of murder, first degree burglary, armed robbery, and criminal conspiracy. He

received two death sentences for the murders,[1] concurrent sentences of thirty years each on the burglary and armed robbery charges, and a concurrent five year sentence for conspiracy. Finding four errors in the guilt phase of the trial, we reverse appellant's convictions and sentences, and remand.

## A. *Facts*

The victims were bludgeoned to death with a hammer and a piece of brick in the West Columbia home they shared. Victim John Pipkin was 63, physically handicapped, legally blind, and in poor health. The other victim, Susan Furman, was in her forties and in poor health. Money was taken from the home, most probably an amount between 700 and 1,000 dollars. No physical evidence other than a bloody boot print was found at the scene.

Appellant was employed by Pipkin as a line cook in the canteen at the Strom Thurmond Federal Building in Columbia. On Friday, February 2, 1996, appellant was angry at Pipkin because he believed that Pipkin had deducted an excessive amount from his paycheck for snacks and drinks consumed on the job. It was common knowledge among the employees that Pipkin ran a cash business, and usually took the profits home with him on Fridays.

Doris Moore called her friend Susan Furman at the home Furman shared with Pipkin at about 6:30 p.m. on Friday, February 2, 1996. While they were on the phone, the doorbell rang at the Pipkin home. Furman told Moore she was not expecting company, and that Pipkin had gone to answer the door. Moore heard a strange man's voice, followed by Furman's scream, and scuffling and knocking noises. After about

---

1. The jury found the following four statutory aggravating circumstances with reference to both victims:
 (a) committed while in the commission of a burglary;
 (b) committed while in the commission of a robbery while armed with a deadly weapon;
 (c) committed while in the commission of a larceny while armed with a deadly weapon; and
 (d) two or more persons were murdered by one act pursuant to one scheme or course of conduct.
 The jury found an additional aggravator in the murder of victim Susan Furman: The murder was committed while in the commission of physical torture.

twenty seconds the phone went dead. Moore called a neighbor of Furman's and Pipkin's, and asked her to check them. The neighbor called John Orr, Pipkin's stepson.

Orr went to the house to check on Pipkin and Furman. He noticed lights that were usually turned on were off, and rang the doorbell several times. When no one answered the door, Orr looked in the windows and saw Furman's body. He entered the house through the storm door, which he was surprised to find unlocked. He then saw Pipkin's body and the blood, and asked another neighbor to call 911. Orr testified that because of the condition of the house's contents, it was clear there had been a struggle..

The victims were killed by blunt trauma to the head, consistent with having been beaten with a hammer. Furman had defensive on wounds on her arms.

The State's case against appellant rested entirely on the testimony of appellant's friend, roommate, and self-confessed accomplice, James Brown. Brown testified that after he and appellant finished smoking crack late on the afternoon of February 2, appellant suggested going to Pipkin's home and robbing him. Brown was familiar with Pipkin and Furman because his girlfriend had worked at the canteen, and Brown had been a frequent visitor. Brown testified both he and appellant had been to the Pipkin home before February 2.

According to Brown, he and appellant planned the robbery in the room appellant rented in Brown's parents' house in Cayce. Brown took stockings from his mother's room for disguises, and he and appellant left on foot, headed for Pipkin's West Columbia home. Along the way, Brown and appellant ran into a friend of Brown's, Darryl Good. Good testified that he recalled meeting Brown late that afternoon, and identified appellant as the man with Brown. Good's testimony is the only evidence independent of Brown's testimony placing the two together in the vicinity of the Pipkin home on Friday, February 2.

Brown testified that as they approached the area where Pipkin lived, appellant gave him a hammer which Brown recognized as belonging to his parents. A few minutes later, appellant picked up a brick and broke it, telling Brown he was

bringing it along because there were "some dogs down through there."

Brown testified he and appellant entered Pipkin's fenced yard and walked up on the front porch. Brown pointed out to appellant that Furman, visible through a window, was on the phone. Appellant knocked on the door, and Brown pulled down the stocking he had on his head. Appellant wore gray mittens. Appellant identified himself[2] through the door, and when Pipkin opened it, appellant knocked him down and ran to Furman and began hitting her with the piece of brick. Brown shut the front door and sat down next to Pipkin.

According to Brown's testimony, he hit Pipkin in the head with the hammer once, then gave it to appellant. Brown held Furman's arms while appellant repeatedly hit her in the head. Brown took Furman's wallet and ransacked a back bedroom while appellant remained in the living room area, apparently hitting Pipkin with the hammer. Appellant came back to the bedroom, told Brown to take the now bloody hammer, and "mess with the lock on the back door" to give the appearance of a burglary. Meanwhile, appellant, still wearing mittens, went through Pipkin's briefcase and took the money bag.

According to Brown, he and appellant left through the back door, scaled the fence, and began walking on this rainy night, going from West Columbia across the Jarvis Klapman Boulevard bridge into Columbia. Brown testified he dropped the hammer near Pipkin's home, and that appellant put his mittens in a storm water drain. Following his arrest, Brown led police to the hammer; the mittens were never recovered.

After returning to Brown's parents' home where they changed clothes and divided the money, Brown testified he and appellant partied through the night. The next day they were smoking crack at a friend's house when someone called to say the police were surrounding Brown's parents' home. Appellant went to check on the situation, then returned to the friend's house. Appellant and Brown later went to the parents' house, and were told to leave. They walked most of the way from Columbia to Sumter that night in a snowstorm. Video tapes from two convenience stores along the Sumter

---

2. Why he did so after he and Brown had prepared disguises is unclear from the record.

Highway show appellant and Brown together in the stores on Saturday, February 3.

The police were looking for appellant based on information given them by Pipkin's stepson, John Orr. They learned appellant and Brown were often together. They located Brown in Sumter on Tuesday, February 6, and he returned with officers to Lexington. In his first statement, he denied any involvement in the crimes. He was then arrested, and gave a second statement which was largely consistent with his trial testimony. Appellant was later arrested.

Appellant raises six issues on appeal, four alleging error in the guilt phase, and two in the penalty phase.

## B. *Guilt Phase Issues*

Appellant claims he is entitled to a new trial based on three evidentiary errors and one jury charge error. We agree. These four issues are:

(1) Whether the trial judge erred in limiting appellant's cross-examination of Brown?;

(2) Whether the trial judge erred in admitting expert testimony of the "barefoot insole impression" found inside the boot which left the bloody print at the crime scene?;

(3) Whether the trial judge erred in allowing witness Orr to testify he had given police officers appellant's name when they asked if Orr knew anyone who might harbor a grudge against victim Pipkin?; and,

(4) Whether the trial judge erred in altering the reasonable doubt charge given the jury after appellant had given his closing argument in reliance upon the original charge?

## 1. *Impeachment*

Brown had an extensive criminal record dating back to 1976, and a history of plea bargaining. His criminal record is reflected below:

| INDICTMENT | COUNTY | CHARGE | DISPOSITION |
|---|---|---|---|
| 75–GS–32–613 | Lexington | Housebreaking | YOA not to exceed 15 months and 18 months probation |

| INDICTMENT | COUNTY | CHARGE | DISPOSITION |
| --- | --- | --- | --- |
| 76–GS–32–988 | Lexington | Housebreaking Larceny by Privily Stealing | Nolle Prossed because of plea on other charges |
| 76–GS–32–989 | Lexington | Grand Larceny of a Vehicle | Nolle Prossed because of plea on other charges |
| 76–GS–32–990 | Lexington | Housebreaking Larceny | Nolle Prossed because of plea on other charges |
| 76–GS–32–991 | Lexington | Housebreaking Larceny | Nolle Prossed because of plea on other charges |
| 76–GS–32–992 | Lexington | Grand Larceny of Vehicle | 10Y |
| 76–GS–32–993 | Lexington | Housebreaking | 15Y susp to 10Y and 5Y probation |
| 76–GS–32–994 | Lexington | Housebreaking Larceny by Privily Stealing | Nolle Prossed because of plea on other charges |
| 76–GS–32–995 | Lexington | Housebreaking Attempted Larceny | 15Y susp to 10Y and 5Y probation |
| 76–GS–32–1009 | Lexington | Housebreaking Larceny by Privily Stealing | 5Y |
| 83–GS–32–335 | Lexington | Housebreaking Larceny | 15Y susp to 5Y Consecutive to 83–336 |
| 83–GS–32–336 | Lexington | Housebreaking Larceny | 15Y susp to 5Y Consecutive to 83–335 |
| 89–GS–40–1671 | Richland | Burglary 1 st degree | 15Y |
| 89–GS–40–1691 | Richland | Carrying a Pistol Unlawfully | Nolle Prossed because of plea to other charges |
| 89–GS–40–1692 | Richland | Resisting Arrest | Nolle Prossed because of plea to other charges |

On direct examination, the State elicited Brown's prior convictions. Brown testified he faced the death penalty for

his role in these crimes and that he had not been promised anything in exchange for his testimony. He acknowledged that the solicitor's office would decide after this trial whether to pursue the death penalty against him. He was asked why, with full knowledge of the charges against him, and full knowledge of the possibility of the death penalty, he was testifying at this trial. Brown replied, "Well, I can't save my life, but I can at least save my soul." He then proceeded to narrate his version of the crimes, identifying appellant as the leader and himself as the follower, and minimizing his own participation in the horrific assaults that killed the victims.

On cross-examination, appellant sought to question Brown about his prior plea bargains, to show his knowledge of the system and the ways it could be manipulated, and to show bias and motive in his trial testimony and its manner of presentation. Appellant's attorney pointed out that he intended to emphasize the past deals Brown had made with the Lexington County Solicitor's office, the same office that would decide Brown's fate in this current case. The judge declined to allow appellant to explore this issue before the jury. Appellant contends this limitation of impeachment pursuant to Rule 608(c), SCRE, was reversible error. We agree.

Under Rule 608(c), "Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." This subsection of Rule 608 preserves South Carolina precedent holding that generally, "anything having a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness may be shown and considered in determining the credit to be accorded his testimony." *State v. Brewington*, 267 S.C. 97, 226 S.E.2d 249 (1976)(citing 98 C.J.S. Witnesses § 460). Brown's credibility was the central issue in this case.

Appellant's defense was that, rather than acting as appellant's less culpable accomplice, Brown was the sole perpetrator of the offenses.[3] Brown also chose to present himself to

---

3. This was not an incredible defense. It is feasible that one person could have overwhelmed the two disabled victims. Further, the woman on the phone with Furman heard only one male voice, only one shoe

the jurors as motivated solely by concern for his salvation, and not by hope of receiving a lesser sentence. Significantly, Brown's most favorable deal had been made with this same solicitor's office.

This situation is unlike that presented in *State v. Aleksey*, 343 S.C. 20, 538 S.E.2d 248 (2000). In *State v. Aleksey, supra*, the defendant sought to impeach an eyewitness about specific charges which had been dismissed against her in New Jersey. That witness was neither the self-confessed accomplice to the murder for which the defendant was on trial, nor was there any evidence of her participation in the crime other than a retracted confession by the defendant. Obviously, there was no connection between the prosecutor's office in New Jersey which had dismissed the charges and the solicitor's office which was prosecuting the defendant.

In this case, appellant sought to explore past dealings between Brown and the office prosecuting the current charges, not to impeach Brown through those dismissed charges, but rather to expose Brown's bias and prejudice in the present case. This excluded evidence had "a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity" of Brown's testimony. *State v. Brewington, supra*. We hold the trial judge committed reversible error under Rule 608(c) in refusing to permit appellant to conduct this cross-examination. In light of this holding, we need not reach appellant's argument that he should have been permitted to cross-examine Brown about the dismissed charges under Rule 608(b), SCRE.

## 2. *Expert Testimony*

A single boot print was found on Pipkin's bloody kitchen floor. The "steel toe" boots which made the impression, as well as another pair of "high-top" boots, were found in the room appellant rented at Brown's parents' home. Brown claimed appellant wore the "steel toe" boots connected to the crime, while he wore the pair of high-top boots also found in the room.

---

print was found at the scene, and Brown led the police officers to the hammer.

At trial, the State was permitted to introduce testimony that the "barefoot impressions" left on the "steel toe" boots' insoles were consistent with the boots having been worn by appellant. Appellant contends this "barefoot insole impression" evidence is not scientifically reliable, and further that SLED agent Derrick who conducted the examination was not a qualified expert. Finally, he argues that even if there exists such a science, and even if Derrick were qualified, the prejudicial impact of the testimony outweighed its probative value. We find this "science" unreliable, and reverse the trial court's decision to admit this evidence.

Scientific evidence is admissible under Rule 702, SCRE, if the trial judge determines: (1) the evidence will assist the trier of fact; (2) the expert witness is qualified; (3) the underlying science is reliable, applying the factors found in *State v. Jones*, 273 S.C. 723, 259 S.E.2d 120 (1979); and (4) the probative value of the evidence outweighs its prejudicial effect. *State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999). The trial judge's decision to admit or exclude the evidence is reviewed on appeal under an abuse of discretion standard. *Id.*

The central thesis of "barefoot insole impression" evidence is that the primary wearer of footwear, over time, begins to leave an impression of the wearer's foot in the footwear's insole. Inked impressions of the suspected wearer's feet, photos of the suspected wearer's known insoles, and a standing cast of the suspected wearer's foot are compared to the impressions in the boots, both visually and by using calipers to compare distances between toes and other features among the various exhibits. A Canadian researcher (Kennedy), who testified for the State at trial, is currently conducting a study following R.C.M.P.[4] troopers and their new boots throughout the training process. Kennedy has compared the insole impressions made in some 200 Canadian army boots with the feet of the wearers. He began research in the area in 1989 after earlier work done by Dr. Louise Robbins was discredited.[5] Kennedy testified that different researchers use differ-

---

4. Royal Canadian Mounted Police.

5. Kennedy is hoping to establish that each human foot is unique, but at present the most that can be said is that a foot may be "consistent" with a barefoot impression.

ent methods in making these type comparisons, but that he felt his method (the one used by Agent Derrick) was the best. He also testified that he has revised some of his statements, but none of his methods, based on comments received after publication of his peer-reviewed articles.

In conducting the tests here, Agent Derrick relied upon a talk he heard several years earlier, three books, two of which were published before 1989, and a phone conversation with Kennedy.

■ We agree with appellant that the "scientific" evidence admitted at his trial does not meet the requirements for admissibility, and therefore need not address his contentions that Agent Derrick was not a qualified expert, and that the prejudicial impact of this evidence outweighed whatever probative value it may have had. *State v. Council, supra.* The *Jones* reliability factors take into consideration:

(1) the publications and peer reviews of the technique;

(2) prior application of the method to the type of evidence involved in the case;

(3) the quality control procedures used to ensure reliability; and

(4) the consistency of the method with recognized scientific laws and procedures. *State v. Council, supra.*

The State relies most heavily on Kennedy to establish that there is a science underlying "barefoot insole impressions." While Kennedy testified that he had published several peer-reviewed articles, he also testified that he was still in the process of collecting data in order to determine which standards were appropriate for comparison purposes. Further, he candidly acknowledged that earlier work in this area had been discredited.

We find the evidence presented here insufficient to meet the *Jones'* requirements that: (1) the technique be published and peer-reviewed; (2) the method has been applied to this type evidence; and (3) the method be consistent with **recognized** scientific laws and proceedings. In our opinion, it is premature to accept that there exists a science of "barefoot insole impressions."

An additional issue arises here as the result of the *Jones* requirement that the quality control procedures used ensure reliability. Neither Agent Derrick nor anyone connected with SLED had ever done this type of test before. Further, Agent Derrick admittedly had not conducted the testing in conformity with SLED's quality control precautions. The director of the SLED laboratories testified that SLED requires a written protocol on all laboratory procedures, which must be "thoroughly tested to prove their scientific validity, accuracy and repeatability." Here, there was no written protocol in existence [6] when Agent Derrick conducted his testing, much less one which had been subjected to SLED's quality control policies.

We find, therefore, that the trial judge erred in permitting expert testimony purporting to demonstrate that "barefoot insole impression" testing revealed appellant's foot to be consistent with the impression made by the primary wearer of the "steel toe" boot. The admission of this evidence mandates reversal of appellant's convictions.

### 3. *Identification*

 Victim Pipkin's stepson John Orr, who discovered the bodies, remained at the scene until the police arrived. Over appellant's *in camera* objection that the evidence improperly put appellant's character in issue, the trial judge allowed this series of questions and answers:

Q.: Now, Mr. Orr, I was askin' you that night after all the law enforcement officers got there, did you give the police officers the name of a person they should talk to about what happened to [the victims]?

A.: He had asked me if I knew anyone who might have a grudge against [Pipkin].[7]

Q.: Did you give 'em a name?

A.: Yes, sir.

Q.: And what name did you give 'em?

---

**6.** An assistant solicitor created a protocol, in anticipation of trial, after Agent Derrick had done the testing here.

**7.** Nowhere in the *in camera* hearing did the witness indicate the question had been posed as "who had a grudge." He rephrased the inquiry in open court.

A.: Jeff.

The trial judge then instructed the jury:

> Ladies and gentlemen of the jury, I've allowed this testimony in only for the purpose of allowing the testimony later in which the police officers will explain why they began to look for Mr. Jones particularly. It is not for the purpose of the truth of the allegation itself. Those [sic] aren't the issue. The issue is why the police officers began to look for Mr. Jones. You will hear testimony from them on that later. That is the only reason that it's introduced at this time. Alright. Go ahead.

Appellant contends this identification of him as the immediate suspect in the double homicide constitutes reversible error. We agree. In *German v. State*, 325 S.C. 25, 478 S.E.2d 687 (1996), this Court reversed a conviction where there were references to a police officer receiving tips that the defendant was selling crack cocaine. We held these references were improper comments on the defendant's character, and distinguished *State v. Brown*, 317 S.C. 55, 451 S.E.2d 888 (1994). Evidence that police began an investigation because of reports of criminal activity are admissible under *State v. Brown, supra.* However, identification of an individual as the suspect of a criminal investigation, based upon speculation and effectively calling into question that individual's character, is not. *German v. State, supra.*

The State argues any error in admitting Orr's testimony was harmless. First, they point out the trial judge gave a "limiting" instruction. We decline to hold that a limiting instruction always cures an evidentiary error. *Cf. State v. Smith*, 290 S.C. 393, 350 S.E.2d 923 (1986) (curative instruction not always sufficient to alleviate prejudice). Second, the State contends Orr's testimony was merely cumulative to other evidence that appellant was angry on the day of the murders because he felt victim Pipkin had "shorted" him on his pay. Orr's identification of appellant as an individual with a grudge sufficient to commit a double homicide is qualitatively much more damning than the statement that appellant thought Pipkin had shorted him. Under the circumstances of this case, given the extent to which the State's case depended upon the credibility of an admitted accomplice and the defense theory which sought to convince the jury that the accomplice

acted alone, we find the admission of this improper character evidence reversible error.

### 4. *Reasonable doubt charge*

At the charge conference prior to the guilt phase closing arguments, neither appellant nor the State objected to the trial judge's indication that he planned to give the reasonable doubt charge outlined in *State v. Manning,* 305 S.C. 413, 409 S.E.2d 372 (1991). In *Manning,* this Court suggested that the jury be charged, "A reasonable doubt is the kind of doubt that would cause a reasonable person to hesitate to act." *Id.* at 417, 409 S.E.2d at 375.

Appellant's closing argument was designed to exonerate him and inculpate Brown. It focused on the fact the crime could have been committed by a single individual; on the dearth of evidence of appellant's participation other than Brown's inconsistent statements; and on Brown's credibility problems and criminal record. After reviewing the evidence, appellant's attorney turned to the law:

> Now I am gonna talk to you about a couple of concepts that we have in the law. And one is the burden of proof that the state has. Why do we have that? The state goes first. They go first and they get to present their evidence first, and the reason for that is they have the burden of proof. That's the way it should be. Because you know, a lot of times it's impossible or if not impossible to prove that you didn't—that you weren't somewhere. They have a positive burden of proving that.

> The judge is gonna define reasonable doubt, and he's gonna tell you that reasonable doubt, and he's gonna tell you that reasonable doubt is a doubt that would cause a reasonable person to hesitate to act. Well, when you go through this testimony and this evidence in this case, you're gonna hesitate and you're gonna hesitate and you're gonna talk and it's gonna get slow and you're gonna hesitate and you're finally gonna have to stop. And when you stop you're gonna have to say that, you know, he's innocent. The state hasn't carried their burden.

He emphasized again:

> I want you to listen real carefully to the law. I want you to listen particularly carefully when [the judge] talks about

reasonable doubt and the burden of proof and the presumption of innocence 'cause those are the concepts.... I'm gonna ask you and I'm gonna urge you to listen to the law as the judge charges you; apply it and use your common sense....

Following counsel's argument and appellant's brief statement to the jury, the jury was excused. The solicitor then asked the judge to excise from his reasonable doubt charge the language:

....cause a person to hesitate to act based on [appellant's attorney's] closing argument to tell the jury to go in there and discuss the evidence and deliberate you hesitate to act.

Now that's not what the law is. We would request that you not charge reasonable doubt to hesitate to act because based on that argument it's telling that jury well if ya'll deliberate you're hesitating and it's not guilty. So based on the context of the closing argument by [appellant's attorney], that particular piece of law.... I think in the context of the closing argument and what was said to the jury it would be extremely prejudicial to charge hesitate to act.

Appellant's attorney responded he had merely argued the law, and that if he had been inaccurate, then the solicitor should have objected during his closing, rather than trying to change the charge after the fact. The solicitor continued to argue the 'hesitate to act' language was "prejudicial out the window" in light of appellant's counsel's argument. The judge took the solicitor's request under advisement and called a recess.

When he returned, the judge stated that he would excise the "hesitate to act" language in order not to "confuse" the jury. Appellant's attorney argued that his closing argument had been structured around the *Manning* charge given the parties the night before. The judge agreed there was nothing improper about the closing argument, but stated that he wanted the jury to "feel alright" about engaging in deliberation and discussion.

Appellant argues that it was fundamentally unfair to alter the reasonable doubt charge after he structured and delivered his argument around the "hesitate to act" language. We agree.

■ The *Manning* charge, although not required, is a correct statement of South Carolina law. Appellant reasonably relied upon the judge's representation that he intended to give that charge to the jury. The decision to alter the charge, after the argument, was fundamentally unfair. *See United States v. Kostoff,* 585 F.2d 378 (9ᵗʰ Cir.1978); *compare State v. McWee,* 322 S.C. 387, 472 S.E.2d 235 (1996)(no fundamental unfairness where judge declined to give charge originally agreed to because there was no reliance upon original charge); *see also State v. Woomer,* 277 S.C. 170, 284 S.E.2d 357 (1981) *subsequent history omitted (* where defendant was induced to take stand under promise of limited questioning, reversible error to subject him to full examination because he relied upon limitation); *cf. State v. Day,* 341 S.C. 410, 535 S.E.2d 431 (2000) (judge's refusal to charge self-defense where warranted unfairly hamstrung counsel's closing argument); cases construing Fed.R.Crim.P. 30, which provides in part, "The court shall inform counsel of its proposed action upon the requests [to charge] prior to their arguments to the jury."

Appellant's attorney told the jury that the judge would charge them reasonable doubt meant a doubt which would cause a reasonable person to "hesitate to act." The effect of the judge's after the fact decision to excise the hesitate to act language from his charge was to diminish appellant's attorney's credibility in the eyes of the jury. *Compare State v. Pace,* 316 S.C. 71, 447 S.E.2d 186 (1994)(new trial ordered where judge's comments on counsel's age and gender impugned counsel's credibility in jury's eyes); *State v. Simmons,* 267 S.C. 479, 229 S.E.2d 597(1976)(new trial where judge threatened defense counsel with jail because conduct affected jury's view of counsel's credibility).

The trial judge erred when he acceded to the solicitor's demand that the reasonable doubt charge be altered. We again remind prosecutors that they are "ministers of justice and not mere advocates." *State v. Quattlebaum,* 338 S.C. 441, 527 S.E.2d 105 (2000). Their special "responsibility carries with it specific obligations to see the defendant is accorded procedural justice...." Comment, Rule 3.8 of Rule 407, SCACR. It does not serve justice nor instill public confidence when we are required to reverse convictions because of errors such as these.

### C. *Penalty Phase*

Appellant raises two penalty phase issues. First, he complains the trial court committed reversible error in admitting four color photos of the victims, and a color video tape of the crime scene. We disagree.

Two of the still photos show victim Pipkin's body at the scene. These photos were properly admitted in the sentencing phase since they accurately "depict the victim's body in substantially the same condition" in which it was left by the defendant. *State v. Powers,* 331 S.C. 37, 501 S.E.2d 116 (1998). The other two photos depict the wounds to victim Furman's head, with her head shaved at the autopsy. While stark, they are no more disturbing than other photos of Furman's wounds introduced without objection. The number and severity of her injuries are shown by these photos, which were properly admitted to "demonstrate the circumstances of crime and the character of the defendant." *State v. Powers, supra.* The crime scene video was also properly admitted to show the jury the circumstances of the crime. *Id.*

In his second penalty phase argument, appellant contends the trial judge erred in refusing to charge the jury that, if it found an aggravating circumstance, its sentencing choices would be either death or life without possibility of parole. For the reasons given in my dissent in *State v. Kelly,* 343 S.C. 350, 540 S.E.2d 851 (2001), I would require this charge be given at appellant's retrial. Such a charge is not, however, appropriate under this Court's precedents. *Id.; State v. Starnes,* 340 S.C. 312, 531 S.E.2d 907 (2000); *State v. Shafer,* 340 S.C. 291, 531 S.E.2d 524 (2000) *certiorari granted* 530 U.S. 1306, 121 S.Ct. 30, 147 L.Ed.2d 1053 (2000).

### D. *Conclusion*

For the reasons given above, appellant's convictions and sentences are reversed, and the matter remanded for a new trial.

**REVERSED AND REMANDED.**

TOAL, C.J., MOORE, WALLER and BURNETT, JJ., concur.