**STATE of Maine**

v.

**James D. YOUNG.**

Supreme Judicial Court of Maine.

Argued March 28, 1995.
Decided July 20, 1995.

James Ketterer, Atty. Gen., Leanne Robbin (orally), Asst. Atty. Gen., Augusta for the State.

Patrick Larson (orally), Ferm, Collier & Larson, Ellsworth, Julio DeSanctis, Downeast Law Associates, P.A., Orrington, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

ROBERTS, Justice.

James D. Young appeals from the judgment entered in the Superior Court (Hancock County, *Mills, J.*) convicting him of murder, 17–A M.R.S.A. § 201(1)(A) (1983), following a jury trial. He challenges the court's denial of his motion to suppress statements made to investigating officers, the admission of testimony by the medical examiner as to the manner of the victim's death, the court's refusal to give a cautionary instruction on the reliability of accomplice testimony, and the sufficiency of the evidence to support his conviction. We affirm the judgment.

## I.

In May 1992, James Young, Mike Marshall, and Scott Harlow set out on a fishing expedition to Sabao Lake in Washington County. At one point during the expedition, Young pulled a .25–caliber handgun from his pocket, showed it to Harlow, and told him that Marshall was "history." The trio fished in several different spots during the course of the afternoon, drinking and smoking marijuana.

At about two or three o'clock, the group arrived at a beaver pond. Harlow and Marshall waded in to try their luck. Young remained at the vehicle. After a brief unsuccessful attempt to catch fish at the beaver pond, Marshall and Harlow returned to the vehicle. Harlow turned his back on Young and Marshall to take apart his fishing rod. While he was doing so, he heard a gunshot. He turned in time to see Marshall hit the ground. Young was standing over him with the .25–caliber handgun in his hand.

Harlow helped Young load Marshall's body into the vehicle, a 1983 GMC Jimmy. As they headed toward the main road, Marshall seemed to emit gasping noises. Young pulled out a knife and stabbed Marshall's body several times. Young turned off the road more than once seeking a suitable place to dispose of the body. He finally settled on a clear-cut area at the end of a logging road near Route 9. They placed Marshall's body in a shallow trench and covered it.

On June 20, Harlow was arrested on an unrelated matter in Hancock County. Since he knew that Young was "laid up from drinking some cleaning fluid," Harlow felt safe telling the police, including Detective Bruce Setler of the Maine State Police, about the killing of Marshall. Harlow led Setler to the grave site and helped gather various pieces of evidence that Young and Harlow had discarded in the area after the killing. The grave itself was empty, but police located a number of human bones in the area with the assistance of Wraith and Shadow, dogs specially trained to locate human remains.[1] Harlow also told Setler that he, Marshall, and Young were riding in a 1983 GMC Jimmy, registered to Young, on the day of the killing.

Based on Harlow's information and the evidence recovered at the grave site, Setler and Detective Joseph Zamboni decided that they wanted to question Young. In the process of confirming that the Jimmy was registered in Young's name, Setler discovered an outstanding warrant for Young's arrest on a charge of operating under the influence of alcohol. On June 21, Young was arrested on the outstanding OUI warrant while in his vehicle. The Jimmy was seized and transported to the state police crime lab in Augusta. After obtaining a warrant, state police searched the vehicle at the crime lab on June 22. They obtained a second search warrant based on different information and searched the vehicle again on October 22.

In the meantime, Zamboni and Detective Matthew Stewart interviewed Young after his arrest. At the outset of the interview, the officers obtained some biographical information from Young, including his date of birth, residence, and source of income. Stewart then explained to Young that he had been arrested on the OUI charge but that they were interviewing him in connection with the disappearance of Marshall. Young volunteered that he knew Marshall and that he was the payee of Marshall's social security benefits. Stewart then told Young that "we're kinda looking into, to Mike's disappearance. And because you're under arrest for this OUI business.... And you're in custody, you know, I need to read you your Miranda rights." After some further preliminaries, Stewart explained Young's constitutional rights to him pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Prior to the trial, Young moved to suppress the evidence seized from the vehicle and the statements made in the June 21 interview.[2] The court (Washington County, *Alexander, J.*) denied the motion. After a venue change to Hancock County, Young's case proceeded to trial.

At the trial, the State offered the testimony of Dr. Henry Ryan, chief medical examiner for the State of Maine. Ryan testified that his position as chief medical examiner required him to determine from forensic evidence the identity of the decedent, the date of death, place of death, and cause and manner of death. He described the cause of death as the "etiology" of the death. He described the manner of death as a "nonmedical" determination whether the death was accidental, natural, suicide, or homicide.

After describing the process by which he confirmed the identity of the remains, Ryan testified that Marshall died as the result of a gunshot wound to the base of the skull inflicted by a small caliber handgun. Based on the location and angle of the entry wound, Ryan testified that Marshall would have been

---

1. According to the medical examiner, the remains had been disturbed by a large animal or animals, probably a bear. The bones were toothmarked and a large piece of skin recovered from the scene had claw marks on it.

2. Only that portion of the June 21 interview that occurred prior to Young's *Miranda* warnings is in the record before us, although a videotape of the entire interview was apparently in evidence at the trial.

instantly unconscious and beyond recovery.[3] When the State asked Ryan whether he had an opinion as to the manner of Marshall's death, Young objected that such an opinion called for a nonmedical judgment beyond Ryan's expertise. The court overruled the objection and Ryan testified that Marshall's death was a homicide.

Young testified on his own behalf. He admitted that he shot Marshall in the back of the head, stabbed him when he thought he might still be alive, and buried him in a shallow grave. Young maintained, however, that he intended only to scare Marshall by pointing the gun at his head and that he was too "whacked out" to realize that the gun was loaded. He testified that all three men had consumed prodigious quantities of drugs and alcohol throughout the months immediately prior to the killing and on the day of the killing itself. He also ascribed to Harlow a more active role in the post-shooting activities, although he admitted that Harlow played no role in the planning of the shooting or in the actual shooting.

## II.

■ First, Young challenges the trial court's decision to allow the medical examiner to testify that Marshall's death was a homicide. The competence of an expert witness is a determination for the trial court that is conclusive in the absence of clear abuse of discretion. *State v. Barnett*, 480 A.2d 791, 794 (Me.1984). The medical examiner's testimony in this case that Marshall's death was a homicide neither exceeds Ryan's area of expertise nor invades the province of the factfinder. The State elicited uncontroverted evidence that supports the trial court's conclusion that a forensic pathologist is competent to reconstruct the manner of death. Ryan's testimony does not purport to address Young's state of mind at the time of the killing. It therefore does not suffer from the same malady as the proffered testimony at issue in *State v. Flick*, 425 A.2d 167, 171

(Me.1981) (it was not error to exclude medical testimony as to murder defendant's state of mind at the time of the crime).

■ We acknowledge that the testimony of a medical examiner that a death was a homicide may in some cases give rise to confusion among the jury as to the meaning of that term. As Young maintains, the jury might mistakenly conclude that the term "homicide" implies some degree of criminal culpability. We have been careful to point out "the danger inherent in allowing a medical expert to testify in terms which express legal conclusions rather than conclusions which are clearly within the specialized knowledge of the expert." *State v. Mishne*, 427 A.2d 450, 459 (Me.1981). Testimony from the medical examiner as to the defendant's state of mind at the time of the crime would cross the line between proper expert testimony and testimony in the form of a legal conclusion. *See Flick*, 425 A.2d at 171.

■ In response to an appropriate request, the trial court could prevent any potential prejudice by briefly explaining that the term "homicide" merely distinguishes a death caused by another human being from accidental and natural deaths and suicide. In the instant case, Young made no such request. We cannot say that it was an abuse of discretion for the court to fail to give such an instruction *sua sponte*.[4]

■ Young further contends that the court should have suppressed his June 21 statements to police investigators. The court's conclusion that Young's pre-*Miranda* statements to police were not the result of an interrogation and that they were offered voluntarily "will be upheld unless the evidence shows that a contrary inference was the only reasonable conclusion that could have been drawn." *State v. Smith*, 612 A.2d 231, 233 (Me.1992) (quoting *State v. Durepo*, 472 A.2d 919, 921 (Me.1984)). Police officers are "under no obligation to stop a suspect from

---

3. Ryan testified that some involuntary respiratory reflexes originating in the spinal cord might have occurred after the gunshot wound, explaining the gasping sounds heard by Harlow and Young.

4. Even if the court improperly admitted Ryan's testimony, we cannot see how Young was thereby prejudiced. He admitted that Marshall's death was a homicide when he admitted shooting him in the back of the head.

making a voluntary statement which in no way is the product of police interrogation." *State v. Izzo*, 623 A.2d 1277, 1283 (Me.1993) (quoting *State v. Peabody*, 320 A.2d 242, 245 (Me.1974)). In this case, Young spontaneously volunteered that he was a good friend of Marshall's. It was reasonable for the trial court to conclude based on the evidence that the statement was not the result of an improper interrogation.

Similarly, Young misses the mark with his argument that the police used the outstanding warrant against him as a pretext for seizing the vehicle. In this case, the suppression court, applying *State v. Tarantino*, 587 A.2d 1095, 1098 (Me.1991), found that the police had probable cause to seize and secure the vehicle and that it was not necessary to arrest Young in order to do so. That determination is subject to a clear error standard of review. *State v. Pike*, 642 A.2d 145, 147 (Me.1994). Based on Harlow's statement that Young used the Jimmy to transport Marshall's body, the court was justified in concluding that the officers had probable cause to believe that the Jimmy contained evidence of a crime. They therefore could have seized the Jimmy without arresting Young. *See Tarantino*, 587 A.2d at 1098.

Contrary to Young's contention, it was within the trial court's discretion to decline to give an instruction cautioning the jury to scrutinize carefully the testimony of Scott Harlow. The trial court acted properly in giving a more general credibility instruction, calling the jury's attention to the potential self-interest of any witness in assessing that witness's credibility. *See State v. Wright*, 662 A.2d 198, 202 (Me.1995).

Finally, when viewed in the light most favorable to the State, the evidence is sufficient to support the jury's conclusion that Young acted intentionally or knowingly in shooting Marshall. *See State v. Barry*, 495 A.2d 825, 826 (Me.1985).

The entry is:

Judgment affirmed.