697 S.E.2d 629

**In the Matter of the Care and Treatment of Bobbie MANIGO, Appellant.**

**No. 4692.**

Court of Appeals of South Carolina.

Heard March 3, 2010.

Decided June 2, 2010.

Rehearing Denied Aug. 27, 2010.

Appellate Defender LaNelle C. DuRant, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Deborah R.J. Shupe, Assistant Attorney General William M. Blitch, Jr., all of Columbia, for Respondent.

SHORT, J.

The State commenced an action pursuant to the South Carolina Sexually Violent Predator Act[1] (the Act), alleging Bobbie Manigo met the statutory criteria for confinement as a sexually violent predator (SVP). Based on the Act, the State sought Manigo's commitment in a secure facility for long-term care, control, and treatment. The jury found Manigo was an SVP, and the trial court issued an order committing Manigo to the Department of Mental Health for long-term care and treatment. Manigo argues the trial court erroneously: (1) denied his motion for summary judgment; (2) allowed hearsay testimony; and (3) limited the number of witnesses he could call. We affirm.

## FACTS

In 1987, Manigo was convicted of assault and battery of a high and aggravated nature for making sexual remarks while touching the victim. Manigo made sexual remarks to the victim, touched her on her breasts and vagina, and pushed her to the ground and attempted to have sex with her. Manigo was sentenced to ten years' imprisonment, suspended on the service of two years and five years' probation. In 1990, while on probation for the 1987 offense, Manigo was indicted for assault with intent to commit criminal sexual conduct in the first degree. Manigo used a knife and physical force to sexually assault the victim. Manigo pleaded guilty to assault with intent to commit criminal sexual conduct in the second degree. Manigo was sentenced to twenty years' imprisonment. In 2004, the State unsuccessfully sought to classify Manigo as an SVP, and Manigo was released from prison.

In 2006, Manigo followed the victim, masturbated, and urinated in front of her, and repeatedly exposed himself. Manigo pled guilty to indecent exposure. He was sentenced to three years' imprisonment, suspended upon the service of nine months and two years' probation. The State sought to classify Manigo as an SVP. The case went to trial, and a jury found Manigo to be an SVP. The trial court issued an order for commitment, committing Manigo to the Department of

---

1. S.C.Code Ann. § 44–48–10 *et seq.* (Supp.2009).

Mental Health for long-term control, care, and treatment. This appeal followed.

## LAW/ANALYSIS

■ The Act provides for the involuntary civil commitment of SVPs who are mentally abnormal and extremely dangerous. S.C.Code Ann. § 44–48–20 (Supp.2009). In order to commit an individual under the Act, a series of steps must occur. *White v. State*, 375 S.C. 1, 6–7, 649 S.E.2d 172, 174–75 (Ct.App.2007). Initially, the multidisciplinary team, appointed by the Director of the Department of Corrections, must determine if the person meets the definition of an SVP. *Id.*

If the multidisciplinary team finds the person meets this definition, then it refers the case to the prosecutor's review committee. *Id.* The prosecutor's review committee must determine whether probable cause exists to commit the person as an SVP. *Id.* If this committee determines probable cause is present, the Attorney General may file a petition in the circuit court to request a probable cause hearing. *Id.*

At the probable cause hearing, the trial court must determine if there is probable cause to believe the person is an SVP. *Id.* If the trial court concludes there is probable cause, the person is transferred to a secure facility for evaluation by a court-approved qualified expert. *Id.* Ultimately, a trial must be conducted, at which the State must convince the court or jury beyond a reasonable doubt that the person is an SVP. *Id.*

### A. Summary Judgment

■ Manigo argues the trial court erred in denying his summary judgment motion. Specifically, Manigo argues the Act is triggered only if a person is currently serving a sentence for a sexually violent offense, and because his 2006 offense of indecent exposure does not qualify as a sexually violent offense, the trial court lacked jurisdiction to commit him. We disagree.

When reviewing a summary judgment motion, the facts and circumstances must be viewed in the light most favorable to the non-moving party. *Laurens Emergency Med. Specialists, PA v. M.S. Bailey & Sons Bankers*, 355 S.C. 104, 108–09, 584

S.E.2d 375, 377 (2003). A summary judgment motion should be granted when it is clear there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

An SVP is "a person who: (1) **has** been convicted of a sexually violent offense; and (2) suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." S.C.Code Ann. § 44–48–30(1) (Supp.2009) (emphasis added). Section 44–48–40 sets out when a person is to be referred to the multidisciplinary team to determine if the person meets the definition of an SVP. This section states the multidisciplinary team is to be notified "when a person **has** been convicted of a sexually violent offense...." S.C.Code Ann. § 44–48–40 (Supp.2009) (emphasis added).

The cardinal rule of statutory construction is to determine and give effect to the intent of the legislature. *Wade v. State,* 348 S.C. 255, 259, 559 S.E.2d 843, 844 (2002). The best evidence of legislative intent is the text of the statute. *Id.* If the terms of the statute are clear, the court must apply those terms according to their literal meaning. *Id.*

■ Both parties agree that Manigo's conviction for assault with intent to commit criminal sexual conduct is a sexually violent crime. *See* S.C.Code Ann. § 44–48–30 (Supp.2009) (stating assault with intent to commit criminal sexual conduct qualifies as a sexually violent offense). The Act only requires that a person "has been convicted of a sexually violent offense." S.C.Code Ann. §§ 44–48–30(1) and 44–48–40 (Supp. 2009). Neither section requires the person to be currently serving an active sentence for a sexually violent offense. The statutes do not use present tense language, rather they state if the person has committed such an offense and meets the other qualifications set out in sections 44–48–30 and 44–48–40, then the person should be referred to the multidisciplinary team. The Act is unambiguous, and we must give meaning to its terms. *See City of Columbia v. Am. Civil Liberties Union of S.C.,* 323 S.C. 384, 387, 475 S.E.2d 747, 749 (stating if the language in the statute is plain and unambiguous, there is no need to resort to the rules of statutory interpretation and the

court must apply those terms according to their literal meaning).[2]

If the statutes used present tense language, then our interpretation would be different. The case of *Townes v. Commonwealth of Virginia,* 269 Va. 234, 609 S.E.2d 1 (2005), which interpreted Virginia's Sexually Violent Predator Act (SVPA), is instructive on this point. In that case, Townes was convicted of statutory rape in 1973, and this offense qualified as a sexually violent offense for the determination of whether a person is an SVP. *Townes,* 609 S.E.2d at 2. In 1991, Townes completed serving his sentence for the statutory rape conviction. *Id.* However, Townes had committed offenses, none of which were sexually violent, while he was in prison, and as a result, he did not get released on parole until 2002. *Id.* Shortly after his release, Townes was returned to prison for violating his parole. *Id.*

Four months before his scheduled release, the Director of the Virginia Department of Corrections notified the Commitment Review Committee that Townes was subject to review for civil commitment because he had committed a sexually violent offense and had been identified as being likely to reoffend. *Id.* The Commitment Review Committee completed its review of Townes' case and forwarded to the Attorney General of Virginia a recommendation that Townes be committed as an SVP. *Id.*

The Commonwealth of Virginia filed a petition with the trial court for the civil commitment of Townes. *Id.* The trial court conducted a probable cause hearing, held there was probable cause to believe that Townes was an SVP, and ordered that Townes remain in custody until a full hearing could be conducted. *Id.* Townes' counsel filed a motion and argued the trial court lacked jurisdiction because Townes had completed his sentence for the 1973 statutory rape conviction, and he was not incarcerated for a predicate sexually violent offense at the

---

2. Manigo urges us to construe the Act in favor of him and against the State, arguing the Act is penal in nature. We respectfully decline this invitation because "while the Act bestows some of the rights normally associated with criminal prosecutions, it is not intended to be punitive in nature; rather, it sets forth a civil process for the commitment and treatment of [SVPs]." *In re Care & Treatment of Canupp,* 380 S.C. 611, 617–18, 671 S.E.2d 614, 617 (Ct.App.2008).

time of the petition. *Id.* The trial court ruled that although Townes had completed his sentence for the statutory rape conviction, he was subject to commitment as an SVP because he remained incarcerated on another offense. *Id.* Ultimately, the trial court found Townes to be an SVP and ordered him to be committed to the custody of Virginia's Department of Mental Health, Mental Retardation and Substance Abuse Services. *Id.* at 2–3.

On appeal to the Virginia Supreme Court, Townes argued the trial court erred in finding he remained subject to the SVPA, despite the fact that he had completed serving his sentence for the statutory rape conviction, which served as the sexually violent offense. *Id.* The Commonwealth argued the statutes in question did not specifically require the prisoner to be currently serving a sentence for the sexually violent offense, only that a person be in prison and have been convicted of a sexually violent offense. *Id.* The Virginia Supreme Court began by looking at the statutes in question. *Id.* The court stated:

In relevant part, Code § 37.1–70.4 provides:

B.   The Director of the Department of Corrections shall establish and maintain a database of prisoners in his custody **who are incarcerated for sexually violent offenses.** C.   Each month, the Director shall review the database of prisoners **incarcerated for sexually violent offenses** and identify all such prisoners who are scheduled for release from prison within 10 months from the date of such review who receive a score of four or more on the Rapid Risk Assessment for Sexual Offender Recidivism or a like score on a comparable, scientifically validated instrument as designated by the Commissioner.   Upon the identification of such prisoners, the Director shall forward their name, their scheduled date of release, and a copy of their file to the [Commitment Review Committee] for assessment.

Code § 37.1–70.5 provides:

Within 90 days of receiving notice from the Director pursuant to § 37.1–70.4 regarding a prisoner **who is incarcerated for a sexually violent offense,** the [Commitment Review Committee] shall (i) complete its assessment of such prisoner for possible commitment pursuant to subsection B and

(ii) forward its recommendation regarding the prisoner, in written form, to the Attorney General pursuant to subsection C.

*Id.* at 3 (emphasis in original).

The Virginia Supreme Court did not agree with the Commonwealth's argument that the language of these statutes did not limit the application of the SVPA to those prisoners who are currently serving a sentence for a sexually violent offense because such an interpretation would "ignore the present tense of that language." *Id.* Rather, the Virginia high court reasoned that following the Commonwealth's interpretation "would require us to add language and broaden the scope of the act by applying it to prisoners 'who are or previously have been incarcerated for sexually violent offenses.'" *Id.* at 4.

The Virginia statutes use present tense language; however, the South Carolina statutes do not. Namely, section 44–48–40 states the multidisciplinary team is to be notified "when a person **has** been convicted of a sexually violent offense...." S.C.Code Ann. § 44–48–40 (Supp.2009) (emphasis added). As it relates to this case, our statute is different from Virginia's in this one critical aspect.[3]

Additionally, the legislative intent supports our conclusion that the Act only requires that a person be convicted of a sexually violent offense to trigger the process of commitment. Section 44–48–20 states:

The General Assembly finds that a mentally abnormal and extremely dangerous group of [SVPs] exists who require involuntary civil commitment in a secure facility for long-term control, care, and treatment. The General Assembly further finds that the likelihood these [SVPs] will engage in repeated acts of sexual violence if not treated for their mental conditions is significant. Because the existing civil commitment process is inadequate to address the special needs of [SVPs] and the risks that they present to society, the General Assembly has determined that a separate, involuntary civil commitment process for the long-term con-

---

**3.** Also, the Virginia Supreme Court in interpreting the statutes stated they were "subject to the rule of lenity normally applicable to criminal statutes and must therefore be strictly construed." *Townes,* 609 S.E.2d at 4.

trol, care, and treatment of [SVPs] is necessary. The General Assembly also determines that, because of the nature of the mental conditions from which [SVPs] suffer and the dangers they present, it is necessary to house involuntarily-committed [SVPs] in secure facilities separate from persons involuntarily committed under traditional civil commitment statutes. The civil commitment of [SVPs] is not intended to stigmatize the mentally ill community.

S.C.Code Ann § 44–48–20 (Supp.2009).

The foregoing clearly demonstrates our Legislature's intent to identify and provide treatment to SVPs to protect the people of South Carolina. Our Legislature's intent in enacting the Act was to provide treatment through involuntary commitment to individuals who suffer from a mental abnormality to prevent such persons from committing future acts of sexual violence. *See Wade,* 348 S.C. at 259, 559 S.E.2d at 844 (holding the cardinal rule of statutory construction is to determine and give effect to the intent of the legislature).

### B. Hearsay Testimony

█ Manigo argues the trial court improperly allowed hearsay testimony. We disagree.

Dr. Pam Crawford, the forensic psychiatrist who evaluated Manigo, testified about what she learned from Dr. Burke, Manigo's sex offender treatment provider. The following colloquy took place between the State's attorney and Dr. Crawford:

Q: Now, is it important when taking sex offender treatment to admit to the sex offense provider all of your offense?

A: I think it is.

Q: Do you understand that [Manigo] did that?

A: What I learned from [Dr. Burke] was that [Manigo] did not tell Dr. Burke about his prior sex offenses, so Dr. Burke was not aware of the proper pleas, but was only aware of the indecent exposure.

. . .

Q: Was that information a part of the basis for your opinion in this case?

A: Yes.

Manigo objected to this testimony and argued it was hearsay. The trial court overruled the objection.

■ The admission of evidence is within the sound discretion of the trial court. *State v. Pittman*, 373 S.C. 527, 577, 647 S.E.2d 144, 170 (2007). To constitute an abuse of discretion, the conclusions of the trial judge must lack evidentiary support or be controlled by an error of law. *Id.* The admissibility of an expert's testimony is within the trial judge's sound discretion, whose decision will not be reversed absent an abuse of discretion. *Hundley ex rel. Hundley v. Rite Aid of S.C., Inc.*, 339 S.C. 285, 294, 529 S.E.2d 45, 50 (Ct.App.2000).

■ Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. However, an expert witness may state an opinion based ·on facts not within his or her firsthand knowledge. *Rite Aid of S.C. Inc.*, 339 S.C. at 295, 529 S.E.2d at 50–51. The expert may base his or her opinion on information, whether or not admissible, made available before the hearing if the information is of the type reasonably relied upon in the field to make opinions. *Id.* Additionally, an expert may testify as to matters of hearsay for the purpose of showing what information he or she relied on in giving an opinion of value. *Id.*

In the present case, Dr. Crawford testified that she relied on information she received from Dr. Burke to form the basis of her opinion that Manigo was an SVP. Thus, the trial court's ruling does not constitute a reversible error. *See* Rule 703, SCRE ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.").

## C. Witnesses

■ Manigo argues the trial court improperly excluded testimony by some of his witnesses. On appeal, Manigo

asserts his rights to confront and call witnesses were impeded by the trial court's ruling in violation of his United States and South Carolina constitutional rights. Neither of these constitutional arguments were presented to the trial court, and therefore, they are not preserved for our review. *In re McCracken*, 346 S.C. 87, 92, 551 S.E.2d 235, 238 (2001) ("A constitutional claim must be raised and ruled upon to be preserved for appellate review.").

## CONCLUSION

Accordingly, the trial court's decision is

**AFFIRMED.**

WILLIAMS and LOCKEMY, JJ., concur.