721 S.E.2d 413

**The STATE, Respondent,**

**v.**

**Christopher Sam COMMANDER, Petitioner.**

**No. 27062.**

Supreme Court of South Carolina.

Heard June 21, 2011.

Decided Oct. 31, 2011.

256

Chief Appellate Defender Robert M. Dudek and Appellate Defender LaNelle C. DuRant, both of South Carolina Commission on Indigent Defense, of Columbia, for Petitioner.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General Melody

J. Brown, and Solicitor Daniel E. Johnson, all of Columbia, for Respondent.

Chief Justice TOAL.

Petitioner appeals *State v. Commander*, 384 S.C. 66, 681 S.E.2d 31 (Ct.App.2009), claiming the court of appeals erred by affirming the trial court's admission of expert testimony concerning the victim's manner of death and refusal to instruct the jury on the defense of accident. We affirm the court of appeals' decision as modified.

## FACTS/PROCEDURAL BACKGROUND

On January 7, 2005, family members discovered Gervonya Goodwin's (Victim) mummified[1] and partially decomposed body covered by a blanket and lying on a sofa inside her home.[2] Victim's family members and friends had not seen or spoken to her since November 29, 2004. A police investigation revealed (and numerous trial witnesses attested) that Petitioner stole Victim's purse, mobile telephone, and vehicle from her home, sent text messages from Victim's phone to her family members in which Petitioner pretended to be Victim alive and on vacation, withdrew money from her bank account, used her credit cards, made calls on Victim's behalf from her mobile telephone, and used that telephone number as a contact number for a telephone chat line.

At the time of his arrest in New Orleans, Louisiana, Petitioner possessed Victim's vehicle. After police officers gained entry into his hotel room, Petitioner admitted killing Victim.[3] The arresting officers recovered items from Petitioner's hotel

---

1. As noted by the court of appeals, "mummification" occurs after the body dries out due to conditions of low level humidity such that the skin surfaces remain intact and internal organs are preserved anatomically. Dr. Clay Nichols, the State's expert in forensic pathology, testified that the Victim's body most likely became mummified after it lay undiscovered in her heated home for several weeks.

2. Victim was pregnant at the time of her death, and the non-viable fetus was discovered expelled between her legs.

3. While holding a gun to his head, Petitioner stated to the arresting officers, "Get out of the room, I'm going to kill myself like I killed Vonnie," and, in the police car, "I just did what I had to do."

room that connected Petitioner to Victim, including her checkbook, driver's license, birth certificate, ultrasound image, OB–GYN appointment card, a medical slip bearing her name, car keys, and keys to another vehicle that police located in Victim's driveway. Trial testimony established that Victim and Petitioner worked together, lived together, and shared an intimate relationship, that Petitioner fathered Victim's unborn child, and that Victim tried to end the relationship shortly before she disappeared.

■ Petitioner's issues on appeal concern the testimony of two of the State's witnesses. Dr. Clay Nichols testified as the State's expert witness in forensic pathology.[4] Dr. Nichols responded to the crime scene in his capacity as chief medical examiner for Richland County on the day Victim's body was discovered in her home, and subsequently performed an autopsy on the body. Dr. Nichols testified the autopsy did not uncover any evidence of violence or trauma to Victim's body or any other evidence of injury. A later toxicology report was similarly indefinite. However, using the anecdotal history relayed by officers at the scene, together with the lack of normal indicators of physical violence, Dr. Nichols opined that the cause of death was asphyxiation, which would not leave physical marks, and that the manner of death was homicide due to the suspicious nature of Victim's death. The following colloquy occurred when the Solicitor questioned Dr. Nichols about his preliminary findings:

Q. Did you come—after your examination and prior to getting the toxicology reports back, did you come to a preliminary conclusion as [to] the cause of death[5] in this case?

A. Yes, I did.

Q. And what was that, sir?

A. Given the fact that this woman died under suspicious circumstances, that the history I was given was that her—she was already in her house, no one had talked to

---

4. Defense counsel stipulated to Dr. Nichols's qualification as an expert in forensic pathology and did not question his reliability.

5. The parties used the terms "cause of death" and "manner of death" interchangeably.

her for a period of time, her car was missing, her purse was missing, there was some indication that somebody was sending text messages to family members indicating that the dead woman . . . was still alive, this indicated an extremely suspicious circumstance, and I felt that we were dealing with a homicide.

Defense counsel objected to Dr. Nichols's description of the death as a "homicide," asserting it constituted an opinion concerning a legal issue because "homicide" implies criminal culpability. Therefore, defense counsel argued, Dr. Nichols's testimony concerning the cause and manner of death was inadmissible under Rule 702, SCRE, because it invaded the province of the jury. This prompted the trial judge to question Dr. Nichols outside the presence of the jury about the meaning of "homicide" in his line of work. Dr. Nichols replied:

A. Yes, sir. Homicide is someone who died as a result of the actions of another individual.

Q. As opposed to?

A. An accidental cause where somebody unintentionally caused death to another individual.

Defense counsel again objected to Dr. Nichols's reference to intent in his definition of "homicide" and asked the court to provide a curative instruction to the jury. Instead of providing a curative instruction, however, the trial judge allowed the State to proceed with the line of questioning, instructing counsel to question Dr. Nichols further, so that he could explain his definition of "homicide" to the jurors.[6] This directive occasioned the following exchange in front of the jury:

Q. Doctor, what is your definition of homicide?

A. A person that has died as a result of another person's actions.

---

6. In overruling defense counsel's objection, the trial judge observed:

    . . . [H]e has not said in his opinion it was a murder, which gets to intent and malice and whether or not there was malice, but whether it was a homicide, in other words, a death caused by someone else as opposed to an accidental or a natural death. That's where I see the line being drawn. And at this point in time, I don't believe this witness has crossed that line. But that definition [of homicide]—that question needs to be asked [by counsel], or either the Court needs to explain it to the jury.

Q. And in your opinion in this case, was this or could this have been a natural death?

A. No, I don't believe so.

Q. Or an accidental death?

A. No, I don't believe so.

Q. Or a suicide?

A. No, I don't believe so.

Q. And that is your expert opinion?

A. Yes, it is.

Q. During the course of your examination, were there any signs of any kind of disease or anything else that could have caused her death?

A. No.

Q. And as to the cause of death, what was your opinion?

A. Once again, not stabbed, not shot, not beaten, not strangled with hands. And as a result of looking at the body of [Victim] and reviewing the circumstances of her death, I was looking for a cause of death that would leave no marks, no evidence of injury. And as such, I feel that [Victim] died as a result of asphyxiation.

Under cross-examination by defense counsel about the "suspicious circumstances" of the death, Dr. Nichols recounted autopsy procedures and the methodology he used in arriving at his opinion, and stated:

I believe [Victim] died of unnatural causes. And as a result of elimination [of other manners of death], and like you mentioned, the interpolation of the facts of the case, that being her purse is gone, her car is gone, the house is locked up and somebody went through an awful lot of effort to cover up this death,[7] that I feel that [Victim] died as a result of homicide due to asphyxiation.

Finally, Dr. Nichols noted, "I'm not claiming intent. I'm claiming that [Victim] died as a result of somebody else's actions."

Petitioner's "jailhouse lawyer," John F. Presley, also testified at trial. He stated that Petitioner sought legal advice

---

7. Defense counsel did not object to this statement.

from him while both men were detained at the county jail. Presley testified Petitioner told him he admitted to arresting officers that he killed Victim and wondered whether his statements would impair his case. Presley testified that he and Petitioner had the following discussion a few days later:

[Petitioner] said, "What do you think if I told my attorney to tell them that she ... hit me in the head with a stick, we had an argument and she hit me in the head with a stick and I fell unconscious and fell on top of her, and when I regained consciousness she had died from being suffocated?"

And [Presley] said, "Well, no one is going to believe that."

. . .

Well, either later that day or the next day, [Presley] spoke to [Petitioner] again. And [Presley] asked him the question, was [Victim] cheating on him, and he denied that she was cheating on him. And [Presley] asked him was he cheating on her, and he said he had friends like on the side, but it wasn't nothing serious.

And [Presley] asked [Petitioner] then, [Presley] said, well, what really happened then, you know, what really went on. And [Petitioner] said that he and [Victim] had an argument, [Victim] hit him with a stick, and in other words he—she pissed him off and he fell on her and suffocated her. And [Presley] asked [Petitioner] were you unconscious, and [Petitioner] said, no, he wasn't unconscious, he suffocated her.

. . .

[Petitioner] said that he wrapped her body in sheets and placed her body on the sofa somewhere in the house. [Petitioner] placed her body on the sofa and left her there. And [Petitioner] said he took her credit cards and her car. And [Petitioner] went to various states.[8]

---

8. Under cross-examination by defense counsel, Presley testified:

And he asked me a question, what did I think, he wanted my opinion. If he had this lawyer ... what did I think if he told his lawyer to tell the State that his girlfriend ... hit him in the head with a stick and he fell unconscious and fell on her and when he was—when he regained consciousness that she had died from suffocation because he

Presley subsequently informed police that Petitioner admitted killing Victim.

Petitioner asked the trial court to instruct the jury on the defenses of self-defense and accident based on Presley's testimony. The trial court declined Petitioner's request, finding the evidence did not substantiate the charge. Instead, the trial court instructed the jury on the law of murder, voluntary manslaughter, and involuntary manslaughter.

A jury found Petitioner guilty of murder pursuant to S.C.Code Ann. § 16–3–10 (2003).

### ISSUES

I. Whether the court of appeals erred in affirming the circuit court's admission of expert testimony concerning Victim's manner of death?

II. Whether the court of appeals erred in affirming the circuit court's refusal to charge the defense of accident?

### STANDARD OF REVIEW

"The general rule in this State is that the conduct of a criminal trial is left largely to the sound discretion of the presiding judge and this Court will not interfere unless it clearly appears that the rights of the complaining party were abused or prejudiced in some way." *State v. Bridges*, 278 S.C. 447, 448, 298 S.E.2d 212, 212 (1982) (citations omitted). Therefore, in criminal cases, this Court will only review errors of law. *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006) (citations omitted).

### DISCUSSION

### I. Admissibility of Expert Testimony

The admission or exclusion of evidence is a matter within the trial court's sound discretion, and an appellate court may only disturb a ruling admitting or excluding evidence upon a showing of a "manifest abuse of discretion accompanied

---

was on her, he fell on top of her. And I told him, no one is going to believe this.

by probable prejudice." *State v. Douglas,* 369 S.C. 424, 429, 632 S.E.2d 845, 847–48 (2006) (citations omitted).

The court of appeals affirmed the decision of the trial court allowing Dr. Nichols to testify that Victim died as a result of a "homicide" because any error on the part of the trial judge was harmless in view of the overwhelming evidence of Petitioner's guilt. On appeal, Petitioner argues that the court of appeals erred because Dr. Nichols's testimony was inadmissible under Rule 702, SCRE. We disagree.

At the outset, we note that the court of appeals correctly analyzed Petitioner's position under a harmless error analysis. We agree with the court of appeals that the circumstantial evidence implicating Petitioner was overwhelming. *See Vaught v. A.O. Hardee & Sons, Inc.,* 366 S.C. 475, 480, 623 S.E.2d 373, 375 (2005) (citations omitted) ("To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice, i.e., there is a reasonable probability the jury's verdict was influenced by the wrongly admitted or excluded evidence."); *State v. Mizzell,* 349 S.C. 326, 333, 563 S.E.2d 315, 318 (2002) (listing factors of a harmless error analysis, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course the overall strength of the prosecution's case.") (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)); *State v. Mitchell,* 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) ("Error is harmless when it 'could not reasonably have affected the result of the trial.' ") (quoting *State v. Key,* 256 S.C. 90, 180 S.E.2d 888 (1971)).

However, we take this opportunity to expound on the admissibility of Dr. Nichols's expert testimony under Rule 702, SCRE.

Rule 702, SCRE, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. Generally, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Rule 704, SCRE. However, expert testimony on issues of law is usually inadmissible. *Dawkins v. Fields*, 354 S.C. 58, 66–67, 580 S.E.2d 433, 437 (2003) (citations omitted) (finding the trial court properly declined to consider an expert affidavit that "offered some helpful, factual information" but mainly offered legal arguments concerning the reasons the trial court should deny summary judgment); *Green v. State*, 351 S.C. 184, 198, 569 S.E.2d 318, 325 (2002) (affirming the exclusion of expert testimony where "[t]he testimony was not designed to assist the PCR court to understand certain facts, but, rather, was legal argument why the PCR court should rule, as a matter of law, trial counsel's actions fell below an acceptable legal standard of competence."). Likewise, an expert's testimony may not exceed the scope of his expertise. *State v. Ellis*, 345 S.C. 175, 547 S.E.2d 490 (2001) (finding police officer, who was qualified as an expert in crime scene processing and finger-print identification, exceeded the scope of his expertise when he was permitted to testify to conclusions drawn from the location and position of the victim's body at the time of the shooting).

State law requires medical examiners to make an initial inquiry, forming the basis of a medical conclusion, as to the cause and manner of death in certain instances. *See* S.C.Code Ann. § 17–5–530(A)(5) (Supp.2010) ("If a person dies ... in any suspicious or unusual manner ... a person having knowl-edge of the death immediately shall notify the county coro-ner's or medical examiner's office."); *id.* § 17–5–530(B) (re-quiring a coroner or medical examiner once notified to "make an immediate inquiry into the cause and manner of death"). The statute defines "cause of death" as "the agent that has directly or indirectly resulted in a death." *Id.* § 17–5–5(2). On the other hand, "manner of death" is "the means or fatal agency that caused a death." *Id.* § 17–5–5(9). The statute further categorizes the "manner of death" as natural, acciden-tal, *homicidal,* suicidal, and undetermined. *Id.* (emphasis added). To aid in his or her determination of cause and

manner of death, a medical examiner will routinely conduct an autopsy, which is defined by the statute as "the dissection of a dead body and the removal of bone, tissue, organs or foreign objects for the purpose of determining the cause and manner of death." *Id.* § 17–5–210(5).

In this context, then, the testimony that an individual died from "homicide" means simply that he or she died "by the act, procurement, or omission of another" without regard to the criminality of the killing or culpability of the killer. 23 S.C. Jur. Homicide § 2 (2011) (quoting Black's Law Dictionary 661 (5th ed.1979)).[9]

It is well-established in South Carolina that a medical professional, qualified as an expert, may render an opinion concerning the scientific bases of a victim's injuries or death in a criminal trial. Even before the codification of Rule 702, SCRE, the Court explained:

> That in questions of science, skill or trade, or others of like kind, persons of skill, sometimes called experts, may not only testify to facts, but are permitted to give their opinions in evidence. Thus, the opinions of medical men are constantly admitted as to cause of death or disease or the consequences of wounds, and as to the sane or insane state of a person's mind, as collected from a number of circum-

---

9. Our cases and statutes also stand for the proposition that "homicide" does not necessarily connote criminality, even though our criminal justice system categorizes homicide in varying degrees. For example, murder is merely one form of homicide. *See* S.C.Code Ann. § 16–3–10 (defining "murder" as "the killing of any person *with malice afore-thought either express or implied.*") (emphasis added); *see also State v. Elliott,* 346 S.C. 603, 552 S.E.2d 727 (2001) (Pleicones, J., dissenting) ("The recognition of these lesser grades of homicide, and their accompanying lesser punishments, developed as the common law recognized that some killings were more heinous than others: 'The distinction between murder and manslaughter . . . is not merely an arbitrary rule, but is founded on a thorough knowledge of the human heart, and framed in compassion to the passions and frailties which belong to and are inseparable from our natures.'" (quoting *State v. Ferguson,* 20 S.C. Law (2 Hill) 619, 621–22 (1835))), *overruled on other grounds by State v. Gentry,* 363 S.C. 93, 610 S.E.2d 494 (2005); *State v. Lee,* 79 S.C. 223, 60 S.E. 524, 524 (1908) (affirming the following jury instruction: "'Homicide,' Mr. Foreman and gentlemen, is the killing of any human being. Homicide may be felonious, may be justifiable, may be excusable. Murder is felonious homicide, so is manslaughter. Both of them are felonies.").

stances, and as to other objects of professional skill; and such opinions are admissible in evidence, though the witness founds them, not on his own personal observation, but on the case itself as proved by other witnesses.

*State v. Griggs,* 184 S.C. 304, 312–13, 192 S.E. 360, 364 (1937) (quoting *State v. Clark,* 15 S.C. 403, 408 (1881) *and* Greenleaf, vol. 1 § 440). Therefore, a qualified expert [10] is permitted to testify concerning the cause and manner of death under Rule 702, SCRE. *See* Rule 702, SCRE; *see also Baraka v. Commonwealth,* 194 S.W.3d 313, 315 (Ky.2006) (citations omitted) ("[I]t is axiomatic that a determination of the cause and manner which led to a person's death is generally scientific in origin and outside the common knowledge of layperson jurors.").

Because autopsies assist the medical examiner at arriving at the cause and manner of death, it follows that they fall within the purview of the expert's specialized knowledge, and therefore, expert testimony concerning their contents is often deemed helpful to the trier of fact. *See* Rule 702, SCRE. Petitioner argues that an expert should not be permitted to testify concerning autopsy findings which are based on information comprising the circumstantial evidence in a case. In our estimation, however, anecdotal history is routinely relied on by medical professionals in fulfilling their duties under section 17–5–530 of the South Carolina Code. The role played by this information in arriving at a finding as to the cause and manner of death was aptly described by Dr. Nichols under cross-examination when he testified:

[T]here is some confusion as to what [role] the history actually plays in the part of the autopsy. Many people feel the autopsy is nothing more than the dissection of a person and looking at the tissues underneath the microscope. The history is vital and a mandatory part of all autopsies. It's

---

10. In *Griggs,* the Court found the coroner unqualified to testify to the cause of death because he was not a physician. *Id.* at 313, 192 S.E. at 364 ("We do not find where any witness, not a physician, there being some doubt which one of two injuries caused a death, has been permitted to give an opinion as to the cause of death. This is as it should be. The juror of average intelligence would be just as competent to reach a conclusion."). Because the parties stipulated to Dr. Nichols's qualification as an expert in this case, he was qualified to render an opinion as to the cause and manner of death.

such a mandatory part that I must document in every autopsy I do where the history came from and who gave it to me. And without a history, the autopsy, in and of itself, is invalid. The two are not separable, they are part of one another. The autopsy includes the history as well as all the other anatomic and laboratory findings.

Because the anecdotal history is an essential component of any autopsy, we find testimony concerning findings based on this information falls within the umbrella of the expert's specialized knowledge. *See* Rule 703, SCRE; *Peterson v. National R.R. Passenger Corp.*, 365 S.C. 391, 399, 618 S.E.2d 903, 907 (2005) (citations omitted) ("An expert witness may state an opinion based on facts not within his first-hand knowledge, and may base his opinion on information, whether or not admissible, made available to him before the hearing if the information is of the type reasonably relied upon in the field."); *Hundley ex rel. Hundley v. Rite Aid of South Carolina, Inc.*, 339 S.C. 285, 295, 529 S.E.2d 45, 50–51 (Ct.App. 2000) (citations omitted) (stating "an expert may testify as to matters of hearsay for the purpose of showing what information he relied on in giving his opinion of value"); *see also In Re Manigo*, 389 S.C. 96, 106, 697 S.E.2d 629, 634 (Ct.App. 2010). Dr. Nichols testified extensively concerning his methodology, stating he arrived at the cause and manner of death through a process of elimination, in which the lack of physical injury figured prominently into his opinion that Victim died from asphyxiation as a result of homicide. The information gleaned from the police investigation formed merely one aspect of his examination.[11]

---

11. We note that Dr. Nichols did not base his opinion *exclusively* on the circumstantial information provided by the police officers at the scene. *See State v. Vining*, 645 A.2d 20, 20–21 (Me.1994) (finding an expert's opinion "amounted to an assessment of the credibility and investigatory acumen of the police," and should have been a question for the jury, where the physical examination was inconclusive and the ultimate issue in the case was whether the victim was pushed down a staircase by the defendant or accidentally fell, and the medical examiner testified in her "expert" opinion that the victim's death was a homicide based on her "conversations with police investigators"); *see also Rollins v. State*, 392 Md. 455, 897 A.2d 821, 848 (2006) (distinguishing *Vining* because the prosecution's expert in forensic pathology used a process of elimination to exclude various illnesses suffered by the elderly victim in conjunction

However, we recognize that, in certain circumstances, expert medical testimony of this type has the potential to invade the province of the jury. Petitioner urges that "[t]he line is crossed where the physician gives an opinion outside of his medical expertise where he is in reality only enhancing the circumstantial evidence available to the jury with the prestige of a forensic pathologist." Pet'r's Br. at 21. While we agree with the spirit of Petitioner's contention, no such line was crossed in this case.

Of the many courts in other jurisdictions that have considered where to draw the line in these cases, we tend to agree with those courts that have found that expert testimony addressing the state of mind or guilt of the accused is inadmissible. *See, e.g., Rollins*, 897 A.2d at 852–53 (stating "[the expert] did not opine on [the defendant's] guilt, she opined, in her expert opinion, that [the victim] died of smothering and that the time of death of the victim coincided with the time of the robbery," and therefore, the jury could weigh that testimony against the other evidence presented in that case); *State v. Bradford*, 618 N.W.2d 782, 793 (Minn.2000) (finding medical examiner's opinion that the manner of death was a "homicide," rather than a suicide, assisted the jury in determining who shot the victim); *State v. Scott*, 206 W.Va. 158, 164, 522 S.E.2d 626, 632 (W.Va.1999) (noting that "homicide" is a "neutral" term, trial court did not err in admitting medical examiner's testimony that manner of death was homicidal); *State v. Chambers*, 507 N.W.2d 237, 239 (Minn.1993) (finding expert in pathology could not testify to a criminal defendant's *mens rea*, and observing, "A pathologist may appropriately testify to things such as the number and extent of the wounds, the amount of bleeding, whether the wounds were caused by a knife or a blunt instrument, whether a gunshot wound is a contact wound, whether the wounds could or could not have been the result of accident, the cause of death, and so forth, but the pathologist should not be allowed to make an 'expert inference' of intent to kill from these matters. That is for the jury to do.") (quoting *State v. Provost*, 490 N.W.2d 93, 101–02 (Minn.1992)); *State v. Richardson*, 158 Vt. 635, 636, 603 A.2d 378, 379 (Vt.1992) (finding medical examiner's testimony that

with police reports to ultimately arrive at the cause and manner of death).

victim died as a result of "homicide" was properly admitted because the expert did not testify concerning defendant's guilt, and stating "[i]f the jury believed that a crime had been committed, it still had to decide the ultimate question of whether defendant was at all involved in the homicide[ ]"); *Fridovich v. State*, 489 So.2d 143, 145 (Fla.Dist.Ct.App.1986) (finding trial court erred in excluding medical examiner's testimony that death was accidental in a fatal shooting because "[s]uch opinions may support a conclusion that a defendant is not guilty, but the opinions themselves are directed to expert inferences to be drawn from a set of facts, not personal opinions of guilt or innocence[ ]"); *State v. Howard*, 195 Mont. 400, 637 P.2d 15 (Mont.1981) (finding, despite doctor's qualification to testify about the nature and extent of the victim's injuries, doctor could not testify that, based on the nature of the injuries, the person who inflicted them did so with the intent to murder because the jury was as qualified as the doctor to draw an inference of intent from the circumstantial evidence).

In the present case, the circuit court judge relied on *State v. Young*, 662 A.2d 904 (Me.1995), to aid him in determining whether to admit Dr. Nichols's opinion testimony that Victim's death was a homicide, and we think such reliance was appropriate. *Young* is in line with those cases that have allowed an expert to opine that the victim's death was a homicide so long as the testimony does not speak to the defendant's "state of mind at the time of the killing," determining that such testimony "would cross the line between proper expert testimony and testimony in the form of a legal conclusion." *Id.* at 907.

Consequently, we adopt a rule whereby an expert in forensic pathology's opinion testimony as to cause and manner of death is admissible under Rule 702, SCRE, so long as the expert does not opine on the criminal defendant's state of mind or guilt or testify on matters of law in such a way that the jury is not permitted to reach its own conclusion concerning the criminal defendant's guilt or innocence.

We further recognize that, practically speaking, there is a real possibility that a lay juryperson could interpolate into our technical definition of "homicide" his or her preconceived notions of criminal culpability. Depending on the circum-

stances, a jury instruction on the meaning of "homicide" could prove necessary to prevent any resulting prejudice to the criminal defendant. In the present case, not only did counsel for Petitioner inform the trial court that he did not seek an instruction on the meaning of "homicide," but the trial judge went to great lengths to ensure that the jury was aware of the context of Dr. Nichols's testimony. In particular, the trial judge directed counsel to question Dr. Nichols in front of the jury on the meaning of "homicide." In addition, the trial judge gave a standard instruction to the jury concerning the relative weight to accord witness testimony, including expert witness testimony, along with the other evidence in the case.[12] Therefore, we find that any potential prejudice was cured, and the trial judge did not abuse his discretion in admitting the testimony.

## II. Jury Instruction

"An appellate court will not reverse the trial judge's decision regarding a jury charge absent an abuse of discretion." *State v. Mattison*, 388 S.C. 469, 479, 697 S.E.2d 578, 584 (2010) (citing *State v. Pittman*, 373 S.C. 527, 647 S.E.2d 144 (2007)). "To warrant reversal, a trial judge's refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant." *Id.* at 479, 697 S.E.2d at 583 (citing *State v. Burkhart*, 350 S.C. 252, 261, 565 S.E.2d 298, 303 (2002)).

Petitioner contends the court of appeals erred by affirming the trial court's refusal to instruct the jury on the defense of accident. We disagree.

"A jury charge is correct if, when the charge is read as a whole, it contains the correct definition and adequately covers the law." *Mattison*, 388 S.C. at 478, 697 S.E.2d at 583 (citations omitted). "The law to be charged must be determined from the evidence presented at trial." *State v. Cole*, 338 S.C. 97, 101, 525 S.E.2d 511, 512 (2000) (citations omitted); *Mattison*, 388 S.C. at 478, 697 S.E.2d at

---

12. As part of the instruction, the trial judge directed the jurors not to "place any [expert] opinions above the idea of [their] own opinions on the subject" and to form their own conclusions after considering the expert opinions in conjunction with all the other evidence in the case.

583 (citations omitted) (stating that appellate courts should "consider the court's jury charge as a whole in light of the evidence and issues presented at trial"). When reviewing the trial court's refusal to deliver a requested jury instruction, appellate courts must consider the evidence in a light most favorable to the defendant. *Id.* at 101, 525 S.E.2d at 512–13 (citations omitted).

"A homicide will be excusable on the ground of accident when (1) the killing was unintentional, (2) the defendant was acting lawfully, and (3) due care was exercised in the handling of the weapon." *State v. Chatman,* 336 S.C. 149, 153, 519 S.E.2d 100, 102 (1999) (citing *State v. Goodson,* 312 S.C. 278, 440 S.E.2d 370 (1994)). "A homicide is not excusable on the ground of accident unless it appears that the defendant was acting lawfully." *Id.* (citations omitted) (affirming trial court's refusal to instruct the jury on the defense of accident where the evidence established that the defendant engaged in assault and battery and the defendant presented no evidence that he was acting in self-defense).

The court of appeals held Presley's testimony concerning his "strategy session" with Petitioner did not represent evidence of accident because Petitioner "merely sought advice on what to tell his attorney." *Commander,* 384 S.C. at 76, 681 S.E.2d at 36. Therefore, the court of appeals held the trial court acted within its discretion in refusing to charge the jury on accident.

Petitioner contests this characterization of the evidence and submits he deserves a new trial because *State v. Knoten,* 347 S.C. 296, 555 S.E.2d 391 (2001), supports his contention that discrepancies in the evidence cannot divest a criminal defendant of the advantage of using such evidence to support a jury instruction on a lesser-included offense.

In our view, there was no evidence to support an accident charge. Considering Presley's testimony in the light most favorable to Petitioner, Petitioner's conversations with Presley intimate that he may have fallen on top of Victim by accident, but not that he suffocated her by accident. Petitioner's only statement that he accidentally killed Victim was posited as part of a hypothetical question to Presley in an effort to garner legal advice and therefore, does not affirmatively indi-

cate he was unconscious at the time of Victim's death. In contrast, in their later conversation, Presley testified Petitioner stated he *was* conscious when he suffocated Victim. Therefore, we agree with the court of appeals that Petitioner's "strategy session" cannot form the basis of an accident charge under the facts. Accordingly, we affirm the court of appeals as to this issue.

### CONCLUSION

Based on the foregoing, we affirm the court of appeals' decision as modified.

BEATTY, KITTREDGE, JJ., and Acting Justice JAMES E. MOORE, concur. PLEICONES, J., concurring in a separate opinion.

Justice PLEICONES.

I agree that we should affirm the Court of Appeals' decision which upheld petitioner's murder conviction, and agree that there was no error in the refusal to charge accident here. I also agree with the Court of Appeals that any error in Dr. Nichols's testimony that "suspicious circumstances" surrounding the victim's death were evidence of a homicide was harmless beyond a reasonable doubt in light of the overwhelming evidence of petitioner's guilt. *State v. Commander*, 384 S.C. 66, 681 S.E.2d 31 (Ct.App.2009). I do not join that part of the majority's opinion that suggests that a forensic pathologist's testimony regarding the victim's anecdotal history is always admissible under Rule 702, SCRE, as part of the pathologist's opinion as to manner and cause of death. I also do not agree that the term "homicide" is necessarily a neutral term which does not imply death resulting from the criminal act of another. *See* Article 1, "Homicide," of Chapter 3, "Offenses Against the Person," found in South Carolina Code Ann. Title 16, "CRIMES AND OFFENSES."